UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DOCTOR'S ASSOCIATES, INC. : 
    Plaintiff, :
     :
v. :     CIVIL ACTION NO.
     :     3:06-cv-1710(VLB)
QIP HOLDER LLC and IFILM CORP., :
    Defendants. :     February 19, 2010

MEMORANDUM OF DECISION DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [Doc. #186]

The Plaintiff, Doctor's Associates, Inc. ("Subway"), brought this case for
injunctive relief and damages against the Defendants, QIP Holder LLC ("Quiznos")
and iFilm Corp. (collectively, the "Defendants"), asserting claims for false and
deceptive advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §
1125(a), along with Connecticut state law claims for commercial disparagement and
violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et
seq.*. This case arises out of a Quiznos advertising campaign comparing certain
Quiznos sandwiches to certain Subway sandwiches in two national television
commercials and an internet-based contest. Presently pending before the Court is
the Defendants' motion for summary judgment. See Doc. # 186. In addition, the
Defendants have moved to bar the expert testimony and report of Subway's expert
Dr. Joel Howard Steckel, and to bar Dr. Steckel's affidavit submitted with Subway's
response to the Defendants' motion for summary judgment. See Doc. ## 191 and
228. For the reasons set forth below, the Defendants' motion to bar Dr. Steckel's
affidavit is GRANTED. The Defendants' motion to bar the expert testimony and

report of Dr. Steckel is DENIED, as the Court finds Dr. Steckel's testimony and report to be relevant and admissible.  Finally, the Defendants' motion for summary judgment is DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts relevant to the Defendant's motion for summary judgment are undisputed unless otherwise noted.

This case arises from an advertising campaign conducted by Quiznos which highlighted the differences between its products and those of its direct competitor, Subway.  Subway is the franchisor of more than 25,000 sandwich shops worldwide.  Quiznos has more than 4,500 operating franchises.  Quiznos' campaign centered around an initiative at Quiznos to introduce a "double meat" line of sandwiches, which had double the normal portion of meat used in Quiznos' traditional sandwich offerings.

In connection with the campaign, Quiznos produced and aired a television commercial in September 2006 comparing its Prime Rib Cheesesteak sandwich to the Subway menu offering it identified as being most similar, the "Cheesesteak" sandwich (hereinafter the "Cheesesteak Commercial").  The message of the Commercial was that the Quiznos sandwich had twice the meat of the Subway sandwich.

Shortly after the Cheesesteak Commercial aired, Quiznos partnered with iFilm to create a web-based contest called the "Quiznos vs. Subway TV Ad Challenge."  The Contest, which was accessible by logging onto the domain

name "meatnomeat.com," solicited entrants to create a video demonstrating "why you think Quiznos is better."  The Defendants posted four sample videos on the Contest website, as well as contestant videos that complied with the Contest's Rules.

In January 2007, Quiznos produced and aired a second television commercial that compared it's new double meat "Ultimate Italian" sandwich to the Subway menu offering it identified as being most similar, the "Italian BMT" (hereinafter the "Ultimate Italian Commercial").  Again, the message of this commercial was that the Quiznos sandwich had twice the meat of the Subway sandwich featured.  The two television commercials and internet-based contest at issue are described in greater detail below.

On October 27, 2006, Subway sued Quiznos, alleging that the Cheesesteak Commercial was false and misleading in violation of the Lanham Act as well as Connecticut law.  Subway has subsequently amended it's complaint six times to incorporate identical allegations with respect to the Ultimate Italian Commercial and to allege that representations associated with the Contest were also false and misleading.  The Defendants filed their motion for summary judgment on October 15, 2009, and Subway filed it's opposition thereto on November 25, 2009.

A.  <u>Cheesesteak Commercial</u>

From approximately September 18, 2006 through November 3, 2006, Quiznos aired a 30-second television commercial featuring its Prime Rib Cheesesteak ("Prime Rib") sandwich.  The Commercial depicted Quiznos' Prime

Rib sandwich and Subway's Cheesesteak sandwich side-by-side on a tray, while actual consumers commented on the sandwiches and offered unscripted opinions regarding the quantity of meat on the sandwiches.  For example, one man, while looking at the sandwiches, states "meat, no meat."  In another shot, two men are looking at the Subway sandwich and one says he can't see any meat and after a search says "Oh, there it is I see it," while the other man says "it's hard to find" and "oh, there's a little."  Def. Ex. 1.  Another man, while comparing the two sandwiches, refers to the meat on the Quiznos sandwich as "busting out of the sub."  Def. Ex. 1.  The Commercial also contained frames consisting solely of text, which read:  "Quiznos New Prime Rib Cheesesteak vs. Subway Cheesesteak . . . Only Quiznos has real Prime Rib.  And more than 2x the meat."  Def. 56(a)(1) Statement ¶ 17.

The Defendants assert that the "2x the meat" claim made in the Cheesesteak Commercial was accurate based upon the specifications for the Prime Rib and Cheesesteak sandwiches.  According to the Defendants, the specifications for the Quiznos Prime Rib sandwich called for 5.0 ounces of meat, whereas the specifications for the Subway Cheesesteak sandwich called for less than 2.5 ounces of meat.  Prior to airing of the Commercial, Quiznos commissioned an independent expert, Restaurant Marketing Group ("RMG"), to verify the accuracy of the "2x the meat" claim.  RMG concluded that the amount of meat in an average small Quiznos Prime Rib sandwich was at least twice that of the meat in the standard 6-inch Subway Cheesesteak sandwich.  Quiznos also

4

conducted an audit of its stores in the fall of 2006, during which it claims to have found that over ninety-four percent of franchisees were making sandwiches that contained at least 4.0 ounces of meat, and thus twice the meat in the Subway Cheesesteak sandwich.

Subway contends, however, that the Cheesesteak Commercial was false and misleading, citing the following facts.  First, Subway states that, unlike Quiznos, it's consumer model is to make all sandwiches to order.  At all times relevant to this lawsuit, every sandwich on Subway's menu board, including the 6" Cheesesteak sandwich, could be made with a double portion of meat for an extra $0.99 or $1.00.  The Subway Cheesesteak sandwich was available with either a 2.5 oz. portion of a steak, onion, and pepper mixture (including between 1.67 to 1.77 oz. of meat), or a 5 oz. portion of the mixture with a double portion of meat (including between 3.34 to 3.54 oz. of meat).  Nevertheless, the Subway Cheesesteak sandwich depicted in the Commercial contained a single portion of meat and was compared to the double portion of meat in the Quiznos Prime Rib sandwich.  The Commercial did not disclose that Subway offered a more comparable sandwich - the Subway Cheesesteak sandwich with a double portion of meat.  In addition, there was no disclosure in the Commercial of the price of the two products.  Subway asserts that the recommended price of the Subway 6" Cheesesteak sandwich was $3.59, or $4.59 with double meat, while the 5" Quiznos Prime Rib sandwich sold for as much as $6.79.  As to the availability of double meat, Quiznos responds that only 50 percent of Subway's customers even

5

knew that double meat was an option, and that the percentage of sandwiches at Subway that were ordered with double meat was 10 percent or lower.

In addition, Subway asserts that it had discontinued the Cheesesteak sandwich at the time the Cheesesteak Commercial aired, and thus the Commercial compared Quiznos' Prime Rib sandwich to a discontinued Subway sandwich. On or about August 4, 2006, Subway advised its franchisees that the Subway Cheesesteak sandwich was being discontinued in favor of a new steak sandwich, with a product rollout between August 21, 2006 and September 24, 2006. The Cheesesteak sandwich was replaced with a diced steak product called the "Steak & Cheese" sandwich. The 6" Steak & Cheese sandwich was available with 2.5 oz. of meat, or, if a customer ordered double meat, 5 oz. of meat. Subway states that it replaced the Cheesesteak sandwich with the Steak & Cheese sandwich in order to offer a more "versatile" product. Unlike the Cheesesteak sandwich, the Steak & Cheese sandwich consisted of diced steak pieces that could be tossed with various seasoning and sauce. Subway began shipping its new diced steak product for the Steak & Cheese sandwich to restaurants the week of September 11, 2006. Subway stopped shipments of the shaved steak product for the Cheesesteak sandwich no later than September 18, 2006. All Subway stores were required to sell the new Steak & Cheese sandwich no later than September 25, 2006.

Franchisees were told to replace their menu boards to offer the new Steak & Cheese sandwich as soon as they began selling the new product, which was

6

done by September 22, 2006 for 92% of stores and no later than September 25, 2006 for all stores.  As of September 18, 2006, the day Quiznos began airing the Cheesesteak commercial, the new Steak & Cheese sandwich was the product being marketed in the vast majority of Subway stores.  However, franchisees were allowed to offer customers the choice to purchase the discontinued Cheesesteak product if they had remaining inventory of shaved steak.  According to Subway's survey of 917 stores conducted while the Cheesesteak Commercial was airing, approximately 65 percent of stores surveyed had inventories of shaved steak, and approximately 38 percent of stores surveyed had more than twenty pounds of shaved steak left in their inventory.  Thus, the Cheesesteak sandwich was still being offered in a majority of Subway stores during at least a portion of the time that the Cheesesteak Commercial aired.  Subway contends that Quiznos became aware of the fact that Subway had discontinued the Cheesesteak sandwich no later than September 21, 2006.

According to Subway, Quiznos was aware that the Cheesesteak Commercial made false claims before it began airing.  In August 2006, Quiznos conducted a field operations survey or "field checks" of the Prime Rib meat portion at 651 franchises.  The testing showed that 27.65% of the 651 sandwiches tested contained less than 5.0 oz. of meat, with 10.29% of the 651 containing less than 4.0 oz. of meat.  On September 15, 2006, Quiznos conducted an additional independent survey of 195 Prime Rib sandwiches at 39 Quiznos stores across 8 markets which found that 74% of the stores made sandwiches containing less

7

than 4.5 oz. of meat.  When combined, the results of the two surveys show that 21.6% of the 690 stores surveyed were serving Prime Rib sandwiches with less than 4.5 oz. of meat, which was nonetheless approximately one ounce more than the Subway Cheesesteak sandwich with double meat.  Subway asserts that Quiznos did not inform the television networks airing the commercial of the results of the field surveys, despite the networks' request for substantiation of Quiznos' "2x the meat" claim.

As mentioned previously, following the August and September surveys, Quiznos conducted an "audit" of 4,370 stores, which involved field checks testing the amount of meat contained in each store's Prime Rib sandwich. Subway contends that franchise owners and/or managers were informed that the field checks would be occurring "in the next few days," and in some cases knew precisely when the audits were being conducted.  The instructions to the personnel conducting the field checks called for the meat to be weighed in the stores, in front of store personnel with sandwiches ordered ahead by telephone prior to them coming to the store to weigh the meat.  The results of the September field operations testing showed that 44.14% of the Prime Rib sandwiches tested contained less than 5 oz. of meat, and 5.86% contained less than 4 oz. of meat.  In performing the field checks, Quiznos allowed up to half ounce deviation from the standard 5.0 oz meat specification, such that sandwiches with as little as 4.5 oz. of meat were deemed acceptable.

Quiznos ultimately issued termination notices to approximately 300

franchisees that failed to comply with the meat specifications for the Prime Rib sandwich.  Quiznos was sued by two such franchisees in the Colorado Second Judicial District, who alleged that there was no real compliance standard in place related to the specifications and that the enforcement process was merely a sham driven by concerns over the Prime Rib Commercial (the "Zig Zag litigation").  The court agreed with the franchisees, finding:

> [T]his whole charade of "terminating" and "defaulting" franchisees who failed the field test was just that - a charade - driven not by Quiznos' genuine concern about whether its franchisees were making sandwiches to spec, but rather by its overriding public relations desire to be able to proceed with its national advertising campaign targeting Subway.  But the public relations monster had to serve two masters - the action Quiznos took once it ferreted out non-complying franchisees had to *look* serious (otherwise what would Subway say?), but it couldn't actually *be* serious, unless Quiznos was willing to lose a potentially huge number of non-complying franchisees, which it was not.

Pl. Ex. 32.  On September 22, 2006, Subway issued a cease and desist letter to Quiznos advising that the Subway Cheesesteak sandwich had been discontinued and that the claims in the Prime Rib Commercial were false and misleading.  Quiznos refused to remove or modify the Commercial.

Quiznos' advertising agency, Ogilvy and Mather ("Ogilvy"), created the Cheesesteak Commercial.  The Defendants maintain that Ogilvy filmed the Commercial according to written procedures designed to ensure that the Commercial fairly and accurately depicted the sandwiches featured.  In accordance with these procedures, the sandwiches filmed in the Commercial were purchased from local Quiznos and Subway stores by members of the

9

production crew posing as ordinary customers.  Also in accordance with procedures, independent third-party public notaries monitored the procurement and filming of the sandwiches.  The notaries signed affidavits attesting that the production crew followed the procedures and that, in the course of producing the Commercial, no one manipulated the sandwiches.

Subway contends, however, that the Subway Cheesesteak sandwich depicted in the commercial did not reflect the appearance of the sandwich when purchased at a Subway store.  According to Subway's deposition witnesses, the sandwich in the commercial appeared "flattened or squished."  Ex. 6, Pace Tr., at 91-94; Ex. 5, Greco Tr., at 209-12.  Subway also claims that Quiznos stores were warned that someone from corporate would be there on the day the commercial was filmed, that corporate personnel and not ordinary customers made the purchases of the sandwiches at Quiznos stores over the course of the day, and that Ogilvy eliminated "problem" Quiznos stores and cherry-picked the best stores from a local listing of stores for the purchases of the Prime Rib sandwiches.  Finally, Subway asserts that a consumer research survey prepared by Subway employee Tricia Kingston in conjunction with Insight Express, LLC showed that the Quiznos sandwich in the Cheesesteak Commercial looked better than what customers experienced in stores, while the Subway sandwich had a worse appearance than what customers experienced in stores.

### B.  Ultimate Italian Commercial

From approximately January 15, 2007 to March 11, 2007, Quiznos aired a 30-

second television commercial comparing it's Ultimate Italian sandwich to Subway's Italian BMT ("BMT") sandwich.  As in the Cheesesteak Commercial, the Ultimate Italian Commercial depicted actual consumers offering unscripted opinions on the quantities of meat in the two sandwiches, which were presented side-by-side on a tray.  For instance, in one vignette a man states, "If I ran out of gas in front of a Subway I would walk ten miles to get the Quiznos sandwich."  Def. Ex. 1.  In another vignette, two men are looking at the Subway sandwich and one states, "I don't see any meat."  Id.  The commercial also includes a person saying "the Quiznos is like stacked with a bunch of meat and the Subway sandwich is like when your kindergarten and your Mom throws some stuff together real quick."  Id.

Also like the Cheesesteak Commercial, the Ultimate Italian Commercial contained frames consisting solely of text, which read:  "Quiznos New Ultimate Italian vs. Subway's Italian BMT.  The Quiznos has 2x the meat."  Def. 56(a)(1) Statement ¶ 117.  In addition, the final text frame contained text that disclosed the following:  "Based upon average precooked weight, in an independent national sampling of Quiznos small Ultimate Italian v. Subway regular 6-inch Italian BMT (12/06).  Sandwich prices differ."  Id. ¶ 118.

The national sample referenced in the text was a study conducted by Guideline, Inc. ("Guideline"), a firm that Quiznos hired to survey and weigh the meats on the Quiznos Ultimate Italian sandwich and the Subway BMT sandwich.  Guideline found that the amount of meat on an average small (5-inch) Quiznos Ultimate Italian sandwich was twice that of the meat on an average 6-inch Subway BMT sandwich.  Further, the specifications for the Quiznos Ultimate Italian sandwich

called for 5.0 ounces of meat, whereas the specifications for the Subway BMT sandwich called for 2.25 ounces of meat.

Ogilvy also created and filmed the Ultimate Italian Commercial.  The Defendants maintain that Ogilvy filmed the Ultimate Italian Commercial according to the same written procedures utilized in the Cheesesteak Commercial, as described above, which the Defendants claim were designed to ensure that the Commercial fairly and accurately depicted the sandwiches featured.

According to Subway, the Ultimate Italian Commercial was also false and misleading because a double portion of meat was always available on the Subway BMT sandwich, and thus the 6-inch BMT was available with 4.5 ounces of meat.  In addition, Quiznos offered a Classic Italian sandwich with a single portion of meat. Subway further contends that the Defendants misled consumers to believe that the two sandwiches were priced equally, but that the Quiznos sandwich was a better value because it had "2x the meat" of the Subway BMT when in fact, the Ultimate Italian sandwich cost significantly more than the BMT sandwich.  In support of its claim that the Ultimate Italian Commercial was misleading as to price and value, Subway cites a survey conducted by it's expert, Dr. Joel Steckel.  Based upon the results of his survey, Dr. Steckel concluded that the Ultimate Italian Commercial misled consumers to believe that the Subway BMT was more expensive than it actually is, and that the two sandwiches are closer in price than they actually are. See infra Section II, Motion to Bar Expert Testimony and Report.

Subway claims that it saw a significant drop in overall sales of approximately 4% after the running of each commercial.

12

### C.  Internet-Based Contest

From approximately October 31, 2006 to December 8, 2006, Quiznos ran an internet-based contest entitled "Quiznos v. Subway TV Ad Challenge" (hereinafter "the Contest").  The Contest sought entries from viewers comparing Subway to Quiznos, offering the public the opportunity to "grab a camera and show us why you think Quiznos is better."  Def. Ex. 62.  iFilm, a leading on-line video network, co-sponsored the Contest.

Quiznos' website invited customers to log onto the Contest website and enter the contest by uploading video submissions.  The website was accessible by logging onto the domain names "quiznos.com," "ifilm.com," or "meatnomeat.com." Prizes for winning entries included the appearance of the winning video on VH1, cash, a year's supply of Quiznos, Video iPods and other merchandise.  The winning video was aired on VH1 on December 15, 2006, and was also posted on a billboard at Times Square in New York City on New Year's Eve.

Quiznos and iFilm created four sample videos that they posted on the website, entitled "Mr. Meat," "Disgruntled Employee," "Co-Workers," and "Barbie Breaks, You Get What You Pay For."  Quiznos created the "Barbie Breaks" video, and reviewed and approved the other three videos, which were created by iFilm. Subway contends that the Defendants referred to the Subway sandwich in a false and misleading manner in each video, including by making multiple references to the amount of meat on a Subway sandwich in the "Mr. Meat" video.

The Defendants also posted contestant submissions on the website.  The Defendants contend that these videos were posted as they were submitted, and

without altering the creative content, in a manner that made it clear that the content was created by the contestants rather than by Quiznos or iFilm.  Subway, on the other hand, claims that the Defendants were responsible for the content of the contestant videos.  In support of this claim, Subway points to the Contest's Official Rules, which provided that "all materials submitted become the property of the sponsors and will not be returned.  Sponsors may use any ideas, concepts, materials, or expression in whole or in part, contained in a video submission."  Pl. Ex. 76.  Subway also cites the submission requirements for an eligible entry, which required a video submission that "compares Quiznos to Subway and illustrates why Quiznos is better than Subway;" the "Judging Criteria" which also required that the videos compare Quiznos to Subway, with Quiznos depicted as superior; and "Thought Starters" posted on the Contest website suggesting ideas for entrant content, including "Double Meat."  Pl. Ex. 77 and 78.

The Contest's Official Rules expressly prohibited, among other things, "any false or misleading statement, or any libelous, slanderous or disparaging statement regarding Quiznos or Subway, or of either companies' products or services."  Def. Ex. 65.  The Defendants undertook the responsibility to review the contest entries, and had the ability to exclude entries containing inappropriate content.  The Defendants claim that they posted contestant videos that complied with the Official Rules.  Subway maintains, however, that the Defendants posted videos that did not comply with the Official Rules in that they contained false or misleading statements or disparaging statements about Subway.  For instance, Subway asserts that the "Mr. Meat" sample video created by the Defendants is false and misleading because

14

it depicts and describes the Subway sandwich as being "all bread;" uses a beauty shot of a Quiznos sandwich in comparison to a false or fake picture represented as a Subway sandwich; refers to the Quiznos sandwich as being named "Big Meaty," being "Heavy" in weight, "Satisfying," and "Fresh" in age while calling the Subway sandwich "Lettuce Starve," and referring to it as "light" in weight, as "Hunger Pain Inducing," and as "Stale" in age; depicting a cartoon sandwich purporting to be a Subway sandwich with no meat showing; and depicting a sign asking "Where's the meat."  Def. Ex. 67.  With respect to contestant entries, Subway cites the following entries as examples of videos that include false and misleading statements:  a Subway sandwich portrayed as a submarine unable to dive because it does not have enough meat; two persons trying to decide where to eat and referring to Quiznos' double meat as a deciding factor, thereby falsely implying that Subway has no double meat option; and a video depicting a sandwich "build off" that explicitly states that Subway's sandwich has little meat and much less meat than Quiznos' sandwich.  Def. Ex. 67.

Subway contends that the Defendants did not remove the three iFilm created sample videos or the contestant entries from the ifilm.com website after the end of the Contest, and that all Contest entries remained available for viewing on iFilm's website as of December 2007.

## II.  MOTION TO BAR EXPERT REPORT AND TESTIMONY

The Defendants move to bar the expert testimony and report of Subway's expert, Dr. Joel Steckel, on the basis that Dr. Steckel's opinions are irrelevant and unreliable under Fed. R. Evid. 403 and 702.

Subway alleges in it's Seventh Amended Complaint that Quiznos' Ultimate Italian Commercial was false and misleading because, inter alia:

(1) the Subway Italian BMT sandwich is not offered as the same product as that to which it is directly compared; (2) the Defendant did not disclose the difference in the two products and made no effort to compare and disclose the prices of the two products or the nutritional components of the two products being compared; . . . (4) the Defendant claimed, directly and indirectly, that its product is superior to Plaintiff's product when the two products are materially different; . . . (6) the Defendant explicitly or implicitly claims the Defendant's product is superior to the Plaintiff's product although they are different in size and price.

7th Am. Compl. ¶ 30 (emphasis added). Thus, Subway alleges that the Commercial in question was misleading because, among other reasons, the sandwiches were not comparable in content or price and the prices of the two sandwiches were not disclosed.

On December 20, 2007, Subway disclosed Dr. Steckel as its expert and served his expert report (hereinafter the "Steckel Survey"). The Steckel Survey was purportedly designed and executed "to test the hypotheses that the commercial [misled] customers by elevating their price perceptions of the Subway sandwich depicted." Pl. Ex. A, Steckel Report ¶ 13. Dr. Steckel hypothesized that "the commercial leads viewers to perceive a) that the Subway price is higher than they would otherwise believe; and b) that the Subway price is more comparable to Quiznos' than it actually is." Id.

In the survey, Dr. Steckel detailed his methodology and results. The Steckel Survey involved 430 respondents obtained from nine shopping malls across the country. Id. ¶¶ 21, 27. The sample or universe for the survey was comprised of "males and females over the age of 18 who plan on visiting a sub shop or fast food

16

restaurant specializing in subs in the next month."  Id. ¶ 20.  Dr. Steckel divided the respondents into two groups:  a test group, to whom he showed the Ultimate Italian Commercial; and a control group, to whom he showed only a "beauty shot" of the Subway sandwich and a description of the sandwich taken from the "Menu" section of Subway's website.  Id. ¶¶ 22-25.  After showing the respondents these stimuli, Dr. Steckel asked all respondents the following introductory question:  "What is the main message, if any, of the ad you just saw?"  Id. ¶ 28(d).

The Steckel Survey next asked all respondents in the test group, who had viewed the Commercial, what they "would expect to pay" for Subway's BMT and Quiznos' Ultimate Italian sandwich based on "the ad you just saw and your knowledge of fast food."  Id. ¶ 28(e) and (h).  Dr. Steckel found that the respondents opined, on average, that the price of the Subway BMT was $4.91 and the price of the Quiznos Ultimate Italian was $5.81.

The Steckel Survey then asked all respondents in the control group, who had viewed only a "beauty shot" of the Subway BMT, to guess the price of the Subway BMT based on "the ad you just saw and your knowledge of fast food."  Id. ¶ 28(e).  Dr. Steckel found that the respondents opined, on average, that the price of the Subway BMT was $4.48.  Id. ¶ 30.  There was no similar control in place for the Quiznos Ultimate Italian sandwich.

Dr. Steckel then determined that the actual "average current market price" of the Subway BMT was $3.84 based on phone calls he made to nine different Subway locations and that the actual "average current market price" of the Quiznos Ultimate Italian was $5.08.  Id. ¶ n.1.  He thus found that the average guesses of the test

17

group respondents regarding the price of the Subway BMT differed by $0.43.  He
also found that the actual price difference between the Subway BMT and the
Quiznos Ultimate Italian was $1.24, while the respondents who viewed the
commercial opined, on average, that the price difference was only $0.90.  According
to Dr. Steckel, the difference in prices given by the test group and the control group
was statistically significant.

Based on the survey, Dr. Steckel concluded that the Quiznos Ultimate Italian
Commercial misled customers about the relative price of the two sandwiches.
Specifically, Dr. Steckel determined, based on the statistically significant price
difference given between the test group and the control group, that consumers were
misled about price in that they were led to believe that the Subway BMT was more
expensive than it actually is, and that the two sandwiches are closer in price than
the actually are.

In Schering Corp. v. Pfizer, 189 F.3d 218 (2d Cir. 1999), the Second Circuit
clarified the standards governing the admissibility of survey evidence.  As the
Second Circuit explained, the "great majority of surveys admitted in this Circuit" fall
into the Fed. R. Evid. 803(3) hearsay exception because "they poll individuals about
their presently-existing states of mind to establish facts about the group's mental
impressions."[1]  The Second Circuit further explained:

---

[1]  Fed. R. Evid. 803(3) excepts from the hearsay rule "[a] statement of the
declarant's then existing state of mind, emotion, sensation, or physical condition
(such as intent, plan, motive, design, mental feeling, pain, and bodily health), but
not including a statement of memory or belief to prove the fact remembered or
believed unless it relates to the execution, revocation, identification, or terms of
declarant's will."

> It is important for district courts to recognize surveys of this type because their qualification for a traditional hearsay exception obviates the need to examine methodology before overruling a hearsay objection. Regardless of the basis cited for admitting these surveys, errors in methodology thus properly go only to the weight of the evidence - subject of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing.

Id. at 227-28.

In so holding, the Second Circuit expressed its agreement with the "modern view" that such surveys "should be admitted as a general rule, and their weight should be determined by whether":

> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

Id. at 224-25.

The Second Circuit further recognized that surveys are particularly important in Lanham Act cases, because in such cases "the mental impressions with which an audience is left can be relevant and sometimes even necessary, to establish what a defendant is implying in a challenged representation.  In fact, although plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, we have held that a district court *must* rely on extrinsic evidence to support a finding of an implicitly false message.  This is because . . . plaintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener that conflicts with reality.  This latter claim

invites a comparison of the impression, rather than the statement, with the truth." Id. at 229 (internal citations and quotation marks omitted).

Thus, Schering makes clear that surveys polling individuals about their presently-existing states of mind to establish facts about the group's mental impressions, like Dr. Steckel's survey in this case, are generally admissible unless their probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues.

As an initial matter, the Court finds that the Steckel Survey is relevant to Subway's claims. The survey purports to show that the Quiznos Ultimate Italian Commercial was misleading because it caused consumers to believe that the Subway sandwich is more expensive than they otherwise would have believed and that Subway and Quiznos' prices for the sandwiches compared in the Commercial are more comparable than they actually are. Dr. Steckel's conclusion goes to consumer perception of value because the Quiznos sandwich depicted in the Commercial purportedly contained a double portion of meat and therefore, if the two products were perceived as costing the same, consumers were arguably misled by the Commercial into believing that the Quiznos sandwich would be a better value for the money. Thus, the Commercial was arguably misleading to consumers because it omitted information explaining the difference in price.

The Defendants' argument that the Steckel Survey does not measure value is unpersuasive. Although the Steckel Survey did not use the term "value," it is clear that his findings support a conclusion that the Commercial was deceptive in regards to the respective value of the two sandwiches. Dr. Steckel determined that the

20

Commercial misled viewers in that it a) "Creates an impression that the Subway sandwich is more expensive than it actually is.  Indeed, those that do not see the comparison will perceive that the sandwich is closer to its actual price;" and b) "Creates an impression that the Subway and Quiznos' prices are more comparable than they actually are."  Pl. Ex. A, Steckel Report ¶ 32.  As noted above, Subway alleges in its Seventh Amended Complaint that the Ultimate Italian Commercial was misleading because it "made no effort to compare and disclose the prices of the two products" and "explicitly or implicitly claims the Defendant's product is superior to the Plaintiff's product although they are different in size and price."  Dr. Steckel's conclusions directly support these allegations, and therefore the Steckel Survey is relevant to the Plaintiff's claims.

Accordingly, the Steckel Survey may be barred under Fed. R. Evid. 403 only if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues.  After examining the methodological flaws in the Steckel Survey proffered by the Defendants, the Court determines that these purported flaws "are not so egregious or clear cut that the Court can conclude that the highly probative value of the survey" to Subway's claims is outweighed by its prejudicial effect.  Playtex Products, Inc. v. Proctor & Gamble Co., No. 02 Civ. 8046(WHP), 2003 WL 21242769, at *2 (S.D.N.Y. May 28, 2003).  The Defendants argue that the Steckel Survey is methodologically flawed because, inter alia, it used an ineffective control, failed to filter out respondents who did not receive a price message, impermissibly led respondents to guess the prices of the sandwiches, used an improper universe, and inappropriately instructed respondents to base their answer on pre-existing

knowledge.

However, as demonstrated by Subway in its memorandum in support of the instant motion, Dr. Steckel was questioned regarding these purported methodological flaws during his deposition and was able to provide a rationale for the design of his survey in each instance.  For example, Dr. Steckel explained that he chose a photograph of the Subway Italian BMT as the control in his survey because he "wanted the control stimulus to be a real-world representation of the type of information consumers might receive about the Subway sub, without comparison being made to the Quiznos sub."  Pl. Ex. A, Steckel Report ¶ 24.  Dr. Steckel further explained that the control he selected controlled for "random or systematic errors that may be introduced if respondents guess . . ., if there are inadvertent signals (despite pretests) in the interview situation or the questioning sequence, or if the respondent has preexisting beliefs" because "it's the comparison with the omission of information and the noncomparable products that creates the misleading perception."  Id. ¶ 22; Pl. Ex. C, Steckel Tr. at 183.  As to the criticism that the survey encouraged guessing because it did not include a "don't know" option, Dr. Steckel explained that a don't know option "is often a cop-out to prevent people from doing the hard work in . . . making some logical conclusion[,]" and that, "in this particular design, it would also encourage guessing in the control, and that would minimize any difference between test and control."  Ex. C, Steckel Tr. at 65-66.  Finally, Dr. Steckel asserted that the universe he used was proper because "[i]n deceptive advertising cases, the relevant universe may be defined as the potential purchaser, the potential decision-maker, or the person to whom the

22

advertisement is addressed."  Ex. A, Steckel Report ¶ 21.

Therefore, the Court finds that the purported methodological flaws in the Steckel Survey go to the weight to be afforded to the survey, rather than to its admissibility.  The Defendants will have an opportunity to raise their concerns about the survey's methodological flaws before the jury at trial.  See Playtex, 2003 WL 2124279, at *2 (admitting survey into evidence at trial in Lanham Act false advertising case and permitting plaintiff to raise its concerns about survey's methodological flaws before the jury).

### III.  MOTION TO BAR AFFIDAVIT

The Defendants also move to bar the Affidavit of Subway's expert, Dr. Joel Steckel, which was submitted as Exhibit 95 to Subway's response to the Defendants' motion for summary judgment (hereinafter the "Steckel Affidavit"), on the basis that the Steckel Affidavit is comprised solely of expert opinions that were not disclosed in Dr. Steckel's Rule 26(a)(2) expert report.

On December 21, 2006, Subway disclosed to the Defendants the expert report of Dr. Steckel.  Dr. Steckel's report contains no discussion of, or reference to, a study performed by Hal Poret or Guideline.

On January 26, 2007, Quiznos filed the "Guideline Study" in connection with its memorandum in opposition to Subway's motion for a temporary restraining order.  See Doc. # 57.  The Guideline Study concluded that the meat on the average Quiznos small "Ultimate Italian" weighs 4.82 ounces, whereas the meat on the average Subway six-inch "BMT" weighs only 2.35 ounces.  On April 4, 2008, the Defendants disclosed the expert report of Hal Poret, Vice President of Guideline.

23

Mr. Poret's expert report contained the same Guideline Study as that included in Quiznos' January 26, 2007 filing.  Nevertheless, the Plaintiff never submitted an expert report rebutting the Guideline Study, nor did Dr. Steckel discuss or reference the Guideline Study during his deposition on July 7, 2008.  Discovery in this case closed on September 14, 2009.  <u>See</u> Doc. # 177.

The Defendants filed their motion for summary judgment on October 15, 2009.  On November 25, 2009, Subway filed its response in opposition thereto.  Attached as Exhibit 95 to Subway's response brief was an Affidavit from Dr. Steckel, in which he criticizes the statistical analysis performed in the Guideline Study and concludes that the Study is unreliable.  None of the opinions contained in the Steckel Affidavit appeared in Dr. Steckel's Rule 26(a) expert report, nor did Subway make any attempt to supplement Dr. Steckel's report at any time.

Fed. R. Civ. P. 26(a)(2)(B) requires expert witnesses to submit, during discovery, a report that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them."  Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The Second Circuit has instructed district courts to consider the following factors in determining whether to preclude evidence under Rule 37(c)(1):  "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of

having to prepare to meet the new testimony; and (4) the possibility of a continuance."  Haas v. Del. & Hudson Railway Co., No. 07-1198-cv, 2008 U.S. App. LEXIS 13417, at *5-*6 (2d Cir. June 24, 2008) (citing Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006)).

Here, Subway has provided no explanation at all as to why it failed to comply with the Rule 26(a)(2) disclosure requirement.  Instead, Subway argues that the Court should not impose the sanction of precluding the Steckel Affidavit because preclusion would cause the Plaintiff severe prejudice, and the Defendants have not sufficiently illustrated that they will be prejudiced if the Affidavit is admitted.

Subway's claim as to the importance of the Steckel Affidavit to it's case is undercut by Subway's actual use of the Affidavit in its response to the Defendants' motion for summary judgment.  Subway's argument regarding the lack of reliability of the Guideline Survey appears in it's response almost as an afterthought - the entire argument as to the Guideline Survey comprises less than two pages of the 63 page response, and is not mentioned until page 47.  Subway cites a plethora of evidence other than the Steckel Affidavit to establish genuine issues of fact regarding Quiznos' assertion that it's sandwich contained double the meat of Subway's comparable sandwich.  In fact, Subway essentially concedes that the Steckel Affidavit is unnecessary to it's case in it's memorandum in opposition to the instant motion, stating:

> The opinions contained in the Affidavit amount to no more than a simple mathematical observation and calculation regarding Hal Poret's essentially double-counting the weights taken of the sandwiches, and how that affects his results in The Guideline Study.  Plaintiff could have explained this information in its Memorandum in Opposition to

25

**Defendants' Motion for Summary Judgment without relying on an affidavit - it does not take an expert to know that double counting measurements is improper and would skew survey results. However, Plaintiff believed this information would be most effectively explained through an affidavit from its survey expert, Dr. Steckel.**

Pl. Mem. in Opposition to Def. Motion to Bar Affidavit at 6-7. Thus, by Subway's own admission, the Steckel Affidavit is not needed to support it's contention that the Guideline Study is unreliable.

The Defendants, on the other hand, would be prejudiced by the Court's consideration of the Steckel Affidavit on summary judgment. This case has been ongoing for over three years. The Court has granted numerous extensions of the discovery deadline. Discovery has been closed since September 2009, and a trial date is scheduled for March 2010. Despite having had more than ample time to do so, Subway never supplemented it's expert report to rebut the Guideline Study, but instead waited until after the close of discovery to file the Steckel Affidavit in it's response to the Defendants' motion for summary judgment. The Defendants moved for summary judgment with the belief that the full factual record of the case was developed. Imposing new discovery burdens on the Defendants for the purpose of allowing them to challenge the information contained in the Steckel Affidavit at this late juncture would cause them significant prejudice. See <u>Acas v. Conn. Dep't of Correction</u>, Civil No. 3:06-cv-1855, 2008 U.S. Dist. LEXIS 76031, at *36 (D. Conn. Sept. 29, 2008) (finding that the defendant would be prejudiced if the Court were to allow the plaintiff to introduce affidavits containing information and conclusions offered for the first time in the plaintiff's response to the defendant's motion for summary judgment); <u>Point Productions v. Sony Music Entertainment, Inc.</u>, 93 Civ. 4001, 2004

U.S. Dist. LEXIS 2676, at *35-*37 (S.D.N.Y. Feb. 20, 2004) (precluding expert affidavits submitted after the close of discovery which raised new matters not previously disclosed in expert reports on the basis that the plaintiff's delayed submission was "inexcusable" and prejudicial to the defendant because it would "thrust new discovery burdens on [the defendant] following the setting of a trial date"); Haas, 2008 U.S. App. LEXIS 13417, at *7 (finding that plaintiff's delay in identifying witness "until after the close of discovery and, moreover, after [the defendant] had prepared and filed its motion for summary judgment" caused prejudice to the defendant).

Finally, Subway has not requested a continuance of the trial date and, given the age of the case and the numerous discovery extensions that have already been granted as well the nominal, if any, prejudice to Subway, the Court is disinclined to grant a continuance for the purpose of allowing the Defendants to examine and challenge the information submitted in the Steckel Affidavit.  Accordingly, the Defendants' motion to preclude the Steckel Affidavit is granted.  The Court will not consider the Affidavit in deciding the Defendants' motion for summary judgment.

## IV.   MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly

27

preclude the entry of summary judgment.'"  Bouboulis v. Transp. Workers Union

of Am., 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist

as to any material facts.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).

If the moving party meets its burden, "an opposing party may not rely merely on

allegations or denials in its own pleading; rather, its response must - by affidavits

or as otherwise provided in this rule - set out specific facts showing a genuine

issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment

demonstrates the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence

that would be sufficient to support a jury verdict in its favor."  Burt Rigid Box, Inc.

v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).  "The non-movant

cannot escape summary judgment merely by vaguely asserting the existence of

some unspecified disputed material facts, or defeat the motion through mere

speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d

118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also

may not rely on conclusory statements or unsupported allegations that the

evidence in support of the motion for summary judgment is not credible.  Ying

Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

The court "construe[s] the evidence in the light most favorable to the

non-moving party and . . . draw[s] all reasonable inferences in its favor."

28

Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006).

### B.  Television Commercials

#### 1.  False Advertising

The Lanham Act prohibits any "false or misleading representation of fact which . . . in commercial advertising or promotion, misrepresents the nature [or] characteristics . . . of another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).  "Two different theories of recovery are available to a plaintiff who brings a false advertising action under § 43(a) of the Lanham Act.  First, the plaintiff can demonstrate that the challenged advertisement is literally false, *i.e.*, false on its face . . .  Alternatively, a plaintiff can show that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers."  Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).  "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public."  Id. (internal quotation marks omitted).

A plaintiff seeking to prove that an advertising claim is literally false "bears a different burden depending on whether [or not] the advertisement purports to be based on test results."  Proctor & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008).  A claim purporting to be based on test results is known as an "establishment claim."  Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62-63 (2d

29

Cir. 1992).  "Hence, where a defendant's advertisement contends that 'clinical tests' prove the superiority of its product (an 'establishment claim'), the plaintiff need only prove that 'the tests referred to . . . were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited.'" <u>Proctor and Gamble</u>, 574 F. Supp. 2d at 345 (quoting <u>Castrol, Inc.</u>, 977 F.2d at 62-63).  "On the other hand, where a superiority claim does not purport to rest on test results, the plaintiff may prove falsity 'only by adducing evidence that affirmatively show[s] [defendant's] claim . . . to be false.'"  <u>Id.</u> (quoting <u>Castrol</u>, 977 F.2d at 62-63).

The Court may determine whether an advertisement is literally false "based on its own common sense and logic in interpreting the message."  <u>Edmiston v. Jordan</u>, 98 Civ. 3298(DLC), 1999 WL 1072492, at *9 (S.D.N.Y. Nov. 24, 1999).  In making this determination, the Second Circuit has instructed district courts to apply the "false by necessary implication" doctrine.  <u>Time Warner</u>, 497 F.3d at 158.  "Under this doctrine, a district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context, *i.e.*, it must consider the advertisement in its entirety and not . . . engage in disputatious dissection."  <u>Id.</u> (internal citations and quotation marks omitted).  "If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of customer confusion is required."  <u>Id.</u> "However, only an *unambiguous* message can be literally false.  Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false."  <u>Id.</u> (internal citations and quotation marks

30

omitted).

As an initial matter, the Cheesesteak Commercial made non-establishment claims because the Commercial did not purport to rely upon any tests to prove the superiority of Quiznos' Prime Rib sandwich.  Therefore, Subway must adduce evidence affirmatively showing the claims made in the Commercial to be false. Subway contends that the Cheesesteak Commercial implies a false message in six ways; first, by claiming that the Quiznos Prime Rib sandwich contains two times the meat of the Subway Cheesesteak sandwich, which Quiznos' own field testing disproved; second, by depicting "men on the street" making statements that they cannot find meat in the Subway Cheesesteak sandwich or that the Subway Cheesesteak sandwich has "no meat"; third, by making an unfair comparison of the Quiznos Prime Rib sandwich, which contained a "double portion" of meat, to the Subway Cheesesteak sandwich which contained a single portion of meat when Subway offered on its menu at all relevant times its own "double portion" of meat; fourth, by presenting the Subway Cheesesteak sandwich in an altered and less appealing state than it looked upon purchase at a restaurant; fifth, by presenting a "beauty shot" of the Quiznos Prime Rib sandwich which looked more appetizing than the sandwich looks upon purchase at a restaurant; and sixth, by comparing the Quiznos Prime Rib sandwich to the Subway Cheesesteak sandwich, a product which Quiznos knew Subway had discontinued and replaced with the Steak & Cheese sandwich.

The crux of the Defendants' argument is that the claims made in the Cheesesteak Commercial were true because the Quiznos Prime Rib sandwich

actually contained two times as much meat as the Subway Cheesesteak sandwich. In support of this argument, the Defendants state that the specifications for the Quiznos Prime Rib sandwich called for 5.0 ounces of meat whereas the specifications for the Subway Cheesesteak sandwich called for less than 2.5 ounces of meat.  The Defendants also cite the RMG study commissioned by Quiznos, which determined that the amount of meat on a "small" Quiznos Prime Rib sandwich averaged between 4.678 to 4.926 ounces while the amount of meat on a 6" Subway Cheesesteak sandwich averaged less than 2.0 ounces.[2]  Finally, the Defendants rely upon Quiznos' "audit" of 4,100 of its 4,500 franchises in September 2006, which found that over ninety-four percent of franchisees were making sandwiches that contained at least 4.0 ounces of meat.  According to the Defendants, this evidence convincingly demonstrates the veracity of the "two times the meat" claim.  With respect to Subway's unfair comparison claim, Quiznos argues that the Cheesesteak Commercial compared standard Quiznos and Subway sandwiches and therefore the availability of add-ons such as "double meat" that Subway may have had available are irrelevant.

The Court is unpersuaded by the Defendants' argument, as the voluminous evidence cited by both parties on summary judgment reveal that there are numerous issues of material fact with respect to Subway's claims that the Prime Rib

---

[2]  The RMG study was not referenced in the Cheesesteak Commercial, and therefore, as Subway acknowledges, Quiznos' post hoc reliance upon it does not render the claims in the Commercial establishment claims.  See Pl. Mem. in Opposition to Def. Motion for Summary Judgment at 25.

Commercial was literally false.  First, the "audit" of franchises that Quiznos relies upon raises questions as to whether the claim made in the Commercial that Quiznos' Prime Rib sandwich contains two times the meat of the Subway Cheesesteak sandwich is false.  Field testing of 651 franchises conducted by Quiznos in August showed that 27.65% of franchises failed to meet Quiznos' standard of 5 oz. of meat, and 10.29% made sandwiches with less than 4.0 oz. of meat.  An independent survey of 195 Prime Rib sandwiches at 39 Quiznos stores conducted on September 15, 2006 found that 74% of the stores made sandwiches containing less than 4.5 oz. of meat.  Finally, the comprehensive survey of 4,370 Quiznos franchises conducted later in September revealed that 44.14% of the Prime Rib sandwiches tested contained less than 5 oz. of meat, and 5.86% contained less than 4 oz. of meat.

Moreover, the validity of the test results are highly questionable.  In connection with the testing, Quiznos issued termination notices to approximately 300 franchisees that failed to comply with the meat specifications for the Prime Rib sandwich.  Two such franchisees sued Quiznos in the Colorado Second Judicial District.  After hearing evidence at trial as to Quiznos' testing procedures and results, the court determined that the entire process was a "charade" driven by Quiznos "overriding public relations desire to be able to proceed with its national advertising campaign targeting Subway."  Pl. Ex. 32.  The court further noted that the action taken by Quiznos in response to the audit results "had to *look* serious" but "couldn't actually *be* serious, unless Quiznos was willing to lose a potentially huge number of non-complying franchisees, which it was not."  Pl. Ex. 32.

33

Therefore, Quiznos' own testing raises questions of material fact as to the veracity of the Commercial's "two times the meat" claim.  While the RMG study may be evidence of the validity of Quiznos' claims, it is far from conclusive at the summary judgment stage given the flaws in the study identified by Subway, including that RMG surveyed only 35 Subway stores out of approximately 25,000 and failed to use a geographically diverse sample size.  The weight to be accorded to the RMG study is best determined by the jury at trial, rather than by the Court as a matter of law.

Furthermore, there is a question of material fact as to whether the "two times the meat" claim was false because the Subway Cheesesteak sandwich, like all of Subway's sandwiches, was available with a double portion of meat for an extra $1.00.  Despite knowing that Subway offered a more comparable double portion of meat on it's Cheesesteak sandwich, Quiznos opted to air the Cheesesteak Commercial comparing a sandwich it had specifically designed to contain a double portion of meat to a Subway sandwich with a single portion of meat.  The Commercial did not disclose that Subway offered a double portion of meat. Moreover, the Subway sandwich depicted in the Commercial had actually been discontinued during the time that the Commercial was airing, and replaced with the Steak and Cheese sandwich, which the parties appear to agree contained at least 2.5 oz. of meat and thus at least half the meat as the Quiznos' Prime Rib sandwich. In these circumstances, a reasonable jury viewing the Prime Rib Commercial in full context may conclude that it was literally false.

The Defendants attempt to escape this conclusion by arguing that the Plaintiff's claims of literal falsity must fail because the message of the Commercial

34

is ambiguous.  See Time Warner, 497 F.3d at 158 ("[O]nly an unambiguous message can be literally false.  Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.").  This argument is unpersuasive.  The Prime Rib Commercial conveys the unambiguous message that the Quiznos' product contains at least twice the meat of Subway's product, and by extension, that Subway's product contains little meat in comparison to Quiznos' product.  This message is clearly conveyed by the direct side-by-side comparison of the two sandwiches along with commentary by "men on the street" indicating that the Subway sandwich has "little meat" or "no meat," as well as by the text frame reading that the Quiznos sandwich has "more than 2x the meat."  As discussed above, there are genuine issues of material fact as to whether these assertions are literally false.  Accordingly, summary judgment must be denied as to Subway's claims based upon the Cheesesteak Commercial.

Subway also contends that the claim in the Ultimate Italian Commercial that the Quiznos Ultimate Italian sandwich contains two times the meat of the Subway Italian BMT is literally false because Subway always offered a double portion of meat on its Italian BMT, and because Quiznos offered a Classic Italian sandwich with a single portion of meat to which Quiznos could have compared the Subway Italian BMT.  Subway further asserts that the statements in the Commercial that the Quiznos Ultimate Italian sandwich is "stacked with meat," which were made in direct comparison to the Subway Italian BMT, falsely imply that the Subway Italian BMT has little meat.

Unlike the Prime Rib Commercial, the Ultimate Italian Commercial makes

establishment claims because it included a text frame purporting to base its "two times the meat" claim on the Guideline Study.  Therefore, Subway may prove that the Ultimate Italian Commercial was literally false by showing that the Guideline Study was not sufficiently reliable.  However, the Court has granted the Defendants' motion to preclude the Steckel Affidavit, which is the only evidence offered by Subway to establish the unreliability of the Guideline Study.  Nevertheless, the absence of any evidence demonstrating the lack of reliability of the Guideline Study is not fatal to the Plaintiff's claims.  The Second Circuit has explained that:

> [T]he "'sufficiently reliable' standard of course assumes that the tests in question, if reliable, would prove the proposition for which they are cited.  If the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden.  In such a case, tests which may or may not be 'sufficiently reliable,' are simply irrelevant.

Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 63 (2d Cir. 1992).

As the Court found with respect to the Cheesesteak Commercial, there are genuine issues of material fact regarding Subway's claims that the Ultimate Italian Commercial was literally false because Subway has produced evidence that the Italian BMT was available with a double portion of meat.  The Guideline Study concluded that the meat on the average Quiznos small "Ultimate Italian" weighs 4.82 ounces, whereas the meat on the average Subway six-inch "BMT" weighs only 2.35 ounces.  However, the Guideline Study failed to address whether the "two times the meat" claim was true in light of the fact that Subway offered a double meat option on its Italian BMT sandwich.  Despite being aware that the Subway Italian BMT was available with a double portion of meat, Quiznos opted to directly compare a

sandwich it specifically designed to contain a double portion of meat to a Subway Italian BMT with a single portion of meat, and failed to disclose that the Subway sandwich was available with double meat.  Moreover, Quiznos itself offered a Classic Italian sandwich with a single portion of meat, which would have been more directly comparable to the Subway Italian BMT with a single portion of meat, but Quiznos instead used its double meat Ultimate Italian sandwich in the Commercial. Accordingly, because the Guideline Study failed to address the Plaintiff's contention that the "two times the meat" claim was false because of the availability of a double meat option on the Subway Italian BMT, the Court is unable to conclude as a matter of law that the claims made in Ultimate Italian Commercial were true on the basis of the Guideline Study.  This determination is best left to the jury after viewing and weighing all of the relevant evidence.

## 2.  Misleading Advertising

A plaintiff may also prove a false advertising claim under the Lanham Act by showing that the advertisement in question, "while not literally false, is nevertheless likely to mislead or confuse consumers."  Time Warner, 497 F.3d at 153.  "[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality - a claim that invites a comparison of the impression, rather than the statement, with the truth."  Id.  "Therefore, whereas plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court *must* rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message."  Id. (internal quotation marks omitted).

37

Evidence of consumer confusion or deception is usually offered through a consumer survey "that shows that a substantial percentage of consumers are taking away the message that the plaintiff contends the advertising is conveying."  Proctor & Gamble, 574 F. Supp. 2d at 345.  "Cases have held that 20% constitutes a substantial percentage of consumers."  Id. (citing Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms, Inc., 19 F. 3d 125, 134 n.14 (3rd Cir. 1994).  "After a plaintiff has established that a substantial number of consumers have taken away the purported message, the district court must then evaluate whether the message is false or likely to mislead or confuse, and may consider factors such as the commercial context, the defendant's prior advertising history, and the sophistication of the advertising audience."  Id. at 346.

With respect to the Cheesesteak Commercial, the only extrinsic evidence cited by Subway to establish that the Commercial is misleading is a survey prepared by Subway employee Tricia Kingston in conjunction with InsightExpress, LLC, along with Kingston's report based on the survey results.  Kingston worked with InsightExpress to prepare an internet-based survey to assess consumer reactions to Quiznos' advertising.  The survey exposed 97 consumers to a thirty second video of the Cheesesteak Commercial comparing the Quiznos Prime Rib sandwich to the Subway Cheesesteak sandwich, and then asked respondents a series of questions about the appropriateness of the comparison made in the Commercial.  See Def. Ex. 72.  The survey results purport to show that consumers found the Commercial to be deceptive because the Quiznos Prime Rib sandwich depicted looked better than what consumers had experienced in the restaurant and the Subway Cheesesteak

38

sandwich depicted looked worse than what consumers had experienced in the restaurant.  The Defendants argue that the survey and the results thereof are hearsay and are therefore inadmissible under Fed. R. Evid. 801.  The Defendants further argue that, as testified to by a representative of InsightExpress, the survey was not designed for litigation purposes and was not designed to measure actual deception or a likelihood of deception with regard to the Cheesesteak Commercial.

As an initial matter, the survey is relevant to Subway's claim that the Cheesesteak sandwich depicted in the Commercial looked less appetizing than what customers experienced in stores.  Further, as discussed above in the Court's analysis of the admissibility of the Steckel Survey, surveys that "poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions" are generally admissible as a hearsay exception under Fed. R. Evid. 803(3).  Schering Corp., 189 F.3d at 227.  The InsightExpress survey falls into this category, because it asked consumers whether they believe the sandwiches appearing in the Cheesesteak Commercial accurately depicted what the sandwiches would look like if ordered from the restaurants.  The Defendants contend that Kingston is not an expert capable of testifying about methodological issues necessary to establish the reliability of the survey.  However, because the survey is admissible as a hearsay exception, the Court need not examine methodology before overruling a hearsay objection.  See id. at 227-28 ("It is important for district courts to recognize surveys of this type because their qualification for a traditional hearsay exception obviates the need to examine methodology before overruling a hearsay objection.").  Any errors in the methodology used to create the survey "go only to

the weight of the evidence - subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing." Id. at 228.  The Defendants fail to identify any evidence from which the Court could conclude that the survey was so flawed that its probative value was outweighed by the risk of prejudice or confusion.  The Defendants' contention that the survey was not properly designed to measure deception or likelihood of deception goes to the weight of the survey, which is an issue to be determined by the trier of fact. Therefore, the Court finds that the InsightExpress survey is admissible, and that it creates a genuine issue of material fact with respect to whether the Cheesesteak Commercial misled consumers regarding the appearance of the Subway Cheesesteak sandwich as compared to the Quiznos Prime Rib sandwich.

With respect to the Ultimate Italian Commercial, Subway has presented a survey conducted by their expert, Dr. Joel Steckel, which the Court has already found to be admissible.  See supra Section II.  As discussed above, based upon the results of his survey, Dr. Steckel concluded that the Ultimate Italian Commercial misled consumers about price in that they were led to believe that the Subway Italian BMT was more expensive than it actually is, and that the two sandwiches are closer in price than the actually are.  Dr. Steckel's conclusion implicates consumer perception of value because the Quiznos sandwich depicted in the commercial purportedly contained a double portion of meat and therefore, if the two products were perceived as costing the same or if the Subway sandwich was not perceived as costing significantly less than the Quiznos sandwich, consumers were arguably misled by the Commercial into believing that the Quiznos sandwich would be a

better value for the money.  Viewing the context of the Commercial, in which the
Quiznos Ultimate Italian sandwich was directly compared and presented as superior
to the Subway Italian BMT sandwich, a reasonable jury could conclude that the
omission of pricing information was misleading and deceptive to consumers
because consumers were misled to believe that the two sandwiches were similarly
priced but the Quiznos sandwich had more than twice the meat and thus was a
better value.  See Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437, 450 (D. Conn. 1994)
(omissions may make a statement untrue in cases concerning a "negative
comparison with a competitor's product that omits information that would weaken a
superiority claim").  Moreover, since viewers were not informed of Subway's double
meat option and the cost of an Italian BMT sandwich with double meat, a jury might
conclude that viewers were misled by Quiznos' failure to compare more comparable
sandwiches.

In support of their argument that the Ultimate Italian Commercial was not
misleading, the Defendants cite a study by Millward Brown, an independent
consumer research company, assessing the impact of the Commercial on
consumers' perceptions.  Millward Brown's February 2007 report found that the
message that consumers took away from the Commercial was that Quiznos'
Ultimate Italian sandwich had "more meat" than Subway's Italian BMT sandwich.
Def. Ex. 4.  Nowhere in the study did Millward Brown conclude that the Commercial
conveyed a price message to consumers.  However, the fact that the Steckel Survey
reached different results than the Millward Brown study creates a genuine issue of
material fact as to whether the Ultimate Italian Commercial misled consumers as to

41

price.  The relative weight to be assigned to the Steckel Survey as compared to the

Millward Brown study is an issue best left to the trier of fact after viewing all

evidence related to the reliability of the respective studies.

Accordingly, the Court finds that there are genuine issues of material fact

with respect to whether both the Cheesesteak Commercial and the Ultimate Italian

Commercial were misleading to consumers, and summary judgment must therefore

be denied as to these claims.

## C.  Internet-Based Contest

The Lanham Act prohibits any "false or misleading representation of fact

which . . . in commercial advertising or promotion, misrepresents the nature [or]

characteristics . . . of another person's goods, services, or commercial activities."

15 U.S.C. § 1125(a)(1)(B).  Subway claims that the Contest violated the Lanham Act

in four ways:  first; the Contest advertised itself as a "meat-no-meat comparison,"

thereby claiming that Subway's product had "little or no meat in it"; second,

Quiznos claimed that its product was superior to Subway's product even though the

products were materially different; third, the Contest solicited videos depicting

Subway's product as having no meat; and fourth, Quiznos continued to compare its

produce to a product that Subway no longer offered for sale.  Seventh Amended

Complaint, ¶ 32.  The Defendants move for summary judgment on the basis that

Subway cannot demonstrate that the alleged representations made in association

with the Contest were false or misleading.

Viewing the Contest in its entirety, the Court holds that there are genuine

issues of material fact with respect to whether the Defendants made false

representations in connection with the Contest.[3]  The Contest solicited entrants

through the domain name "meatnomeat.com," which redirected entrants to the

Contest Home Page.  The domain name itself is arguably a literal falsity, because it

clearly implies that the Subway sandwich has "no meat."

In addition, the Defendants created and posted four "sample videos" which

were designed to shape the Contest submissions.  The sample videos depict the

Subway sandwich as having no meat or less meat than a Quiznos sandwich.  For

instance, the "Mr. Meat" sample video depicts a cartoon sandwich purporting to be

a Subway sandwich with no meat showing and describes the Subway sandwich as

being "all bread," "Lettuce Starve," "light" in weight, "Hunger Pain Inducing," and

"Stale" in age.  By contrast, the Quiznos sandwich is referred to as "Big Meaty,"

"Heavy" in weight, "Satisfying," and "Fresh" in age.  Additionally, the judging

criteria for the contest explicitly required that the contestant's videos make a direct

comparison between Subway and Quiznos depicting Quiznos as superior.  The

Defendants assert that the representations made in association with the Contest are

not literal falsities because no reasonable consumer would have been deceived by

them.  However, the Court believes that what a person is or is not likely to believe is

an issue best decided by the jury after viewing the relevant evidence, not as a matter

---

[3]  Subway has failed to present extrinsic evidence demonstrating that the
Contest caused consumer deception or confusion, and therefore their claims fail to
the extent they allege that the Contest was misleading in violation of the Lanham
Act.  See Time Warner, 497 F.3d at 153 ("a district court must rely on extrinsic
evidence [of consumer deception or confusion] to support a finding of an implicitly
false message").

of law on summary judgment.

The Defendants further argue that they cannot be held liable for the content in either the sample videos or contestant videos because the videos were not "commercial advertising or promotion" under the Lanham Act. Although the Lanham Act does not define the phrase, the Second Circuit has adopted a three-part test for determining whether statements constitute "commercial advertising or promotion." A statement must be (1) "commercial speech;" (2) made "for the purpose of influencing consumers to buy defendant's goods or services;" and (3) "although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir. 2002).

According to the Defendants, the first and second prongs are not satisfied here because the Defendants created the sample videos to provide examples of how consumers could enter the contest, not as commercial speech for the purpose of influencing consumers to buy Quiznos' products. The Defendants further claim that the third prong is not satisfied because the videos were available only to an "extremely narrow" range of viewers who navigated to the contest website and viewed the contents of the videos. These arguments are unpersuasive. The Contest was obviously an internet-based commercial advertising or promotional campaign intended to influence potential consumers to purchase Quiznos' products over Subway's products, and was undisputedly part of Quiznos' national campaign aimed at highlighting the differences between its products and Subway's products.

44

Indeed, Quiznos admits that the Contest was designed to offer the public an opportunity "grab a camera and show us why you think Quiznos is better."  Def. Ex. 62.  The third prong is also clearly satisfied in this case.  By posting the videos containing arguably false representations on the Contest website and allowing access to the website through a domain name which itself contained an arguably false representation, the Defendants made these representations available to anyone with internet access and thus widely disseminated them to the purchasing public.  Furthermore, the Contest was promoted by posting the winning submission on VH1 and on a billboard at Time Square in New York City's most prominent outdoor advertising venue, which was no doubt done in order to generate consumer interest in the Contest and convey the message to consumers that Quiznos' products are superior to Subway's products.  The Defendants' argument that the allegedly false representations contained in the videos were not widely disseminated defies logic and common sense, as there would be no purpose to sponsoring a Contest intended to promote a national chain such as Quiznos if the Contest was accessible to only an "extremely narrow" range of viewers.

Finally, the Defendants argue that they are immune from liability for the contestant videos pursuant to the Communications Decency Act ("CDA"), which provides, in pertinent part, that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).[4]  An "interactive

---

[4]  The Defendants do not claim immunity under the CDA for the four sample videos that they created or the domain name "meatnomeat.com."

computer service" is defined as "any information service system or access software provider that provides or enables computer access by multiple users to a computer service, including specifically a service or system that provides access to the internet . . ." Id. § 230(f)(2).  An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Id. § 230(f)(3).  In enacting the CDA, "Congress made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."  Blumenthal v. Drudge, 992 F. Supp. 44, 51 (D.D.C. 1998).

"Courts engage in a three part inquiry when determining the availability of immunity under the CDA, i.e. [i] whether Defendant is a provider of an interactive computer service; [ii] if the postings at issue are information provided by another information content provider; and [iii] whether Plaintiff's claims seek to treat Defendant as a publisher or speaker of third party content."  Gibson v. Craigslist, No. 08 Civ. 7735, 2009 U.S. Dist. LEXIS 53246, at *9-*10 (S.D.N.Y. June 15, 2009).  "Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly."  Id.

Subway does not dispute that the Defendants were providers and users of an interactive computer service.  The Defendants acted as co-hosts of the Contest website and were jointly responsible for maintaining the website, and thus were "providers" of an interactive computer service.  The Defendants were also "users"

46

of an interactive computer service because they accessed the internet in order to post Contest entries.  Therefore, the first prong of CDA immunity is satisfied.

With respect to the second and third prongs, the Defendants argue that the contestants were the exclusive creators of the content of the videos they submitted and that Subway seeks to hold them liable merely as publishers of the contestant videos.  Subway, on the other hand, claims that the Defendants are liable for false statements made in contestant videos, in addition to statements made in the sample videos, because they went beyond the role of a traditional publisher by "soliciting disparaging material" and "shaping the eventual content" of the contestant videos such that they were "responsible" for the creation or development of information provided through the Contest website.

Thus, the critical inquiry with respect to CDA immunity in this case is whether the Defendants merely published information provided by third parties or instead were actively responsible for the creation and development of disparaging representations about Subway contained in the contestant videos.  See, e.g., MCW v. Badbusinessbureau.com, No. 3:02-CV-2727-G, 2004 U.S. Dist. LEXIS 6678, at *23-*24 (N.D. Tex. Apr. 19, 2004) ("The distinction between merely publishing information provided by a third-party as an interactive computer service and actually creating or developing any of the information posted as an information content provider is critical.  That distinction determines whether the CDA provides immunity to a provider or user of an interactive computer service.") (internal citations omitted); Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101 (9th Cir. 2009).  "Claims against interactive computer services are barred only if they seek to hold the party liable for

47

its exercise of a publisher's traditional editorial functions - such as deciding whether to publish, withdraw, postpone, or alter content." MCW, 2004 U.S. Dist. LEXIS at 24; see also Barnes, 570 F.3d at 1102 ("publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content").

In the case at bar, it is unclear at this stage whether the Defendants have exercised the role of a traditional publisher with respect to the contestant videos, or have gone further and actively participated in creating or developing the third-party content submitted to the Contest website.  In MCW, for instance, the operator of a consumer complaint website was found to have gone beyond the traditional publisher's role because they "actively encourage, instruct, and participate in the consumer complaints posted on the websites" by, inter alia, encouraging consumers to take pictures of a company's owner and offices for posting on the website.  2004 U.S. Dist. LEXIS 6678 at *34-*35.  In the MCW Court's view, by actively soliciting disparaging material, the defendants went beyond the publisher's role and "incurred responsibility for the information developed and created by consumers." Id. at *35.

Here, the Defendants invited contestants to submit videos comparing Subway and Quiznos and demonstrating "why you think Quiznos is better."  The domain name used to solicit entrants for the Contest, "meatnomeat.com," is arguably a literal falsity because it implies that the Subway sandwich has "no meat."  In addition, the four "sample videos" designed by the Defendants to shape the Contest submissions arguably contain false representations because they depict the

Subway sandwich as having no meat or less meat than a Quiznos sandwich.  In these circumstances, the Court cannot conclude, as a matter of law, that the Defendants are not responsible for the creation and development of the contestant materials.  Whether the Defendants are responsible for creating or developing the contestant videos is an issue of material fact, best submitted to the jury after viewing all of the relevant evidence.  A reasonable jury may well conclude that the Defendants did not merely post the arguably disparaging content contained in the contestant videos, but instead actively solicited disparaging representations about Subway and thus were responsible for the creation or development of the offending contestant videos.[5]

### D.  State Law Claims

Finally, the Defendants move for summary judgment with respect to Subway's Connecticut state law claims for commercial disparagement and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq*. ("CUTPA").

In Connecticut, commercial disparagement is "akin to the torts of injurious falsehood and slander of title."  Valtec Int'l, Inc. v. Allied Signal Aerospace Co., No. 3:93CV01171 (WWE), 1997 WL 288627, at *6 (D. Conn. Mar. 7, 1997).  To prove these torts, and thus to prove commercial disparagement, a plaintiff must demonstrate

---

[5]  As the MCW Court explained, the CDA "does not require a court to determine only whether a party creates or develops the information at issue.  Being responsible for the creation or development is sufficient."  2004 U.S. Dist. LEXIS 6678 at *35 n.12.  "This distinction is significant because a party may be responsible for information created or developed by a third party without actually creating or developing the information itself."  Id.

that the defendant made false representations.  See QSP v. Aetna Cas. and Sur. Co., 773 A.2d 906, 918 n.15 (Conn. 2001).  As discussed above, there are genuine issues of material fact with respect to whether the Defendants made false representations in the context of the Prime Rib and Ultimate Italian television commercials and in connection with the internet-based Contest.  Therefore, summary judgment is denied on Subway's commercial disparagement claim.

CUTPA makes it unlawful for a person to engage in "deceptive acts or practices in the conduct of any trade or commerce."  Con. Gen. § 42-110b(a).  The same evidence that establishes a violation of Section 43(a) of the Lanham Act also establishes a violation of CUTPA.  See Nabisco Brands, Inc. v. Kaye, 760 F. Supp. 2d, 29 (D. Conn. 1991); Timex Corp. v. Stoller, 961 F. Supp. 374, 382 (D. Conn. 1997) ("it is not necessary to perform a full CUTPA analysis, as defendants' violation of the Lanham Act alone establishes liability under CUTPA").  Conversely, where a CUTPA claim relies upon allegations tied to a Lanham Act claim, a plaintiff's failure to establish a Lanham Act violation is fatal to it's CUTPA claim.  See Kaye, 760 F. Supp. at 29 (granting summary judgment for defendant on plaintiff's CUTPA claim because plaintiff's Lanham Act claim was dismissed on summary judgment).  Since the Court has held that there are genuine issues of material fact as to whether the Defendants violated the Lanham Act, Subway's CUTPA claim must survive summary judgment as well.

## V.  CONCLUSION

Based on the above reasoning, the Defendants' motion for summary judgment [Doc. # 186] and motion to bar the expert testimony and report of

Subway's expert Dr. Joel Howard Steckel [Doc. # 191] are DENIED.   The Defendants'

motion to bar Dr. Steckel's affidavit submitted with Subway's response to the

Defendants' motion for summary judgment [Doc. # 228] is GRANTED.  This case will

proceed to trial as set forth in the Court's Amended Scheduling Order dated

February 16, 2010, which scheduled jury selection for March 2, 2010 with trial to

commence immediately thereafter.  See Doc. # 264.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 19, 2010.

51